UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDERSON KILL & OLICK, P.C.,

                              Plaintiff,

            - against -

BRAY & GILLESPIE, INC.; BRAY &
GILLESPIE MANAGEMENT, LLC;
CHARLES A. BRAY and JOSEPH
GILLESPIE,

                              Defendants.

Index No.: 1:08-cv-4565 (AKH) (RLE)

Electronically Filed

**DECLARATION OF MICHAEL J. LANE**

1.      I am an attorney admitted to practice in this Court.  I am a
shareholder of the plaintiff, Anderson Kill & Olick P.C. ("AKO").  I make this declaration
(1) in opposition to Defendants' (collectively "Defendants" or "B&G") motion to dismiss
this action for lack of personal jurisdiction and improper venue, or in the alternative, to
transfer the action to the United States District Court for the Middle District of Florida,
(2) in opposition to Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 9(b) and
12(B)(6), and (3) in support of AKO's cross-motion for partial summary judgment on its
claim for an account stated.

2.      As we demonstrate, not only is there jurisdiction in this Court over
the Defendants (and venue is proper), but this case should be adjudicated here in New
York City – the forum the plaintiff chose, where the parties' contract was entered and
where B&G has transacted business.  New York is also where AKO, which is owed
approximately $2.1 million for work performed on behalf of and at the request of the
Defendants, is located.  AKO has properly pleaded its causes of action in the Complaint
under Fed. R. Civ. P. 9(b) and 12(b)(6).

3.      Finally, as a matter of law, as to $857,132.88, the amount due and owing up to and including AKO's statements to B&G sent on January 3, 2008, AKO is entitled to partial summary judgment in that amount on its cause of action for an account stated.

4.      I was the principal shareholder at AKO responsible for representing Defendants in rendering advice and prosecuting and defending a series of litigations in which B&G was a party. AKO's representation of B&G took place over some 22 months from May 2006 to March 2008. During that time, I billed some 2189 hours on B&G matters, often working seven days a week. During that time, B&G paid AKO some $2.031 million in fees and disbursements. As of April 2008, B&G owes AKO some $2.066 million in fees and disbursements. These amounts are net of write-offs AKO gave to B&G of approximately $430,000.

5.      In their moving papers, Defendants make numerous material misrepresentations in their attempt to dismiss the case or transfer it to their local federal court. The fact remains that B&G retained AKO, a national law firm headquartered in New York, to do what AKO is nationally known for; to seek insurance coverage for losses B&G sustained and to advise and represent B&G in other litigations or potential litigations.

**B&G's Retention of AKO**

6.      After being unable to fully enforce their rights to insurance coverage for various hurricane-related losses, Charles Bray and Joseph Gillespie, acting through a series of some 80-90 entities which were the record owners and operators of a group of hotels in Florida, decided to retain AKO for their insurance coverage and related litigation.

7.    Harold Lueken, who at the time of AKO's retention was General Counsel of all of the Bray and Gillespie business entities (including defendants Bray & Gillespie, Inc. and Bray & Gillespie Management LLC) specifically retained me and AKO in May 2006. I had known Mr. Lueken for years, since 1995, when we met through mutual friends.[1] I had worked with Mr. Lueken previously when AKO did substantial legal work for Kmart Corporation, where Mr. Lueken had been General Counsel from 2003-2005.

8.    Upon information and belief, Mr. Bray directed that AKO be hired to do legal work for B&G. Mr. Lueken, acting on behalf of B&G, contracted with AKO on behalf of B&G for various legal matters. The initial matter involved B&G's claim against Lexington Insurance Company ("Lexington"), "and possibly others," for insurance coverage for losses B&G suffered in August and September 2004 from three separate hurricanes that devastated the Daytona Beach area of Florida.

9.    I prepared a retainer agreement (the "Retainer Agreement") in AKO's New York City offices in late May 2006. The Retainer Agreement is on AKO's New York letterhead, was signed by me in New York, and was sent from AKO's New York office to Mr. Lueken to approve and sign. Subsequently, Mr. Lueken did counter-sign the Retainer Agreement and sent it to me in New York. A copy of the Retainer Agreement as signed is attached hereto as Exhibit A.

---

[1]    B&G's allegations that Mr. Lueken and I were classmates at Fordham Law School is simply incorrect – as are many representations made in Defendants' moving papers. I graduated from Fordham Law School in the Spring of 1985; Mr. Lueken started at Fordham Law School in the Fall of 1985 and graduated in 1988. Thus, we not only were not classmates – but we were not even at the law school at the same time. One would think that B&G's present counsel could have done a minimum of research from the public files to get such facts correct.

10.    The Retainer Agreement references both the rules of the New York Appellate Division regarding written retainers and the arbitration system in Part 137 of the Rules of the New York Chief Administrator.  The Retainer Agreement refers to litigation fee disputes in New York by specifically saying that B&G "may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator." Neither Mr. Lueken nor B&G ever objected to these jurisdiction provisions.  The Retainer Agreement offers to provide B&G a copy of Part 137.

11.    In late March 2008, B&G's new in-house counsel emailed me in New York requesting a copy of Part 137.  We promptly provided them a copy; see Exhibit B annexed hereto.

12.    Not only did I sign the Retainer Agreement for AKO, I am the only AKO lawyer specified therein.  The Retainer Agreement provides my then-hourly rate of $475 per hour, and goes on to set out the rates of other AKO attorneys who might be enlisted to work on B&G matters, with their rates being from $175 to $700 per hour.

13.    Mr. Lueken signed the Retainer Agreement for "Bray & Gillespie," without specification of, or limitation to, any particular entity or individual, and returned it to me in New York.  I proceeded to organize a team to work on these matters and to personally direct AKO's representation of B&G.

14.    In the course thereof, I enlisted my then-partner, John Ellison, an experienced insurance coverage attorney who worked out of both the Philadelphia and New York offices of AKO, to be the "insurance expert" to advise and assist me for this representation.  I was the attorney in charge of the representation and responsible for conducting these litigations, using Mr. Ellison's assistance for strategy and insight on

insurance coverage issues.  Mr. Ellison started working on the B&G representation in

May 16, 2006.  Mr. Ellison also participated in strategy conferences and, towards the

end of the representations, conducted several depositions.

15.    In their motion papers, B&G's representatives suggest that

Mr. Ellison was the principal attorney for AKO representing B&G and that I was simply

to be the billing attorney.  Nalley Declaration; ¶¶ 24 – 25; Bray Declaration ¶¶ 28 – 29;

Gillespie Declaration ¶¶ 27 – 28.  Such statements are simply false and Messrs. Bray

and Gillespie know it.  During their representation, I prepared and defended both

Mr. Bray's and Mr. Gillespie's depositions as fact witnesses and, as for Mr. Gillespie, as

a 30(b)(6) witnesses, in several matters.  The best evidence of the true relationship and

the utter falseness of defendants' sworn statements, is that through the 22 months of

representation, I billed 2189 hours to B&G matters, Mr. Ellison billed only 189 hours to

B&G matters.  See Exhibit C, annexed hereto.

16.    I have no idea whether the various B&G officers who have authored

declarations ever reviewed Mr. Ellison's "resume" as they allege, let alone did so before

Mr. Lueken retained AKO.  I know I did recommend Mr. Ellison to B&G to assist me and

be part of the team to provide strategy especially in the insurance coverage matters.

Mr. Bray and Mr. Gillespie also participated with Mr. Lueken in several telephone

conferences to New York to discuss strategy and the status over various matters AKO

was handling for B&G.

### AKO's Significant Victory

17.    In connection with B&G's claim against Lexington, under B&G's

Lexington policy, the coverage provided B&G a recovery (less deductibles) of $25

million "per occurrence."  There were three separate devastating storms in August and

September 2004 -- thereby creating three separate occurrences under the Lexington policy. Lexington paid out, albeit slowly, the full $25 million for the first occurrence. (At the time AKO was retained, in May 2006 (one and one-half years after the storms), Lexington still had not paid out the second and third storms/occurrences.)

18.     As part of pursuing B&G's claims against Lexington, within the first six months of the representation -- in August 2006 -- AKO succeeded in getting Lexington to pay B&G in full the $25 million dollar limit (less deductibles) in coverage under the second of the three storms/occurrences.

19.     In January 2007, as part of AKO's efforts to persuade Lexington to pay the final $25 million limit on the third occurrence/storm, Mr. Lueken came to the AKO's office in New York. At that time, Mr. Lueken met with me and other members of the AKO team. The purpose of gathering in New York was to prepare for an important meeting with Lexington officials and others relating to the final claims surrounding the $25 million limit for the final storm/occurrence. After meeting in New York, we all traveled from New York to Boston for that meeting at Lexington's headquarters. Regrettably, that meeting did not result in a resolution of B&G's claim against Lexington relating to the last storm/occurrence. AKO, on behalf of B&G, later commenced a lawsuit against Lexington. Upon information and belief, that lawsuit is still pending.

20.     In addition, in January and February 2008, Maya Cater made two trips to New York for meetings at AKO's New York office. (Those meetings are detailed in Ms. Cater's Declaration, submitted herewith.)

21.     I deny the suggestion, at page 5 of the B&G memo (and in the three supporting declarations which make bald, unsupported statements), that I

somehow improperly gave legal advice to Mr. Lueken regarding his compensation arrangements with B&G.  That simply is not true.  During that period, however, I did advise Mr. Lueken regarding an accident involving his late father (and resolved that matter favorably for his elderly mother); I prepared a codicil to his mother's will before she died of a lingering terminal illness; and I also arranged for Mr. Lueken's mother to obtain American citizenship – (again, before she died.)  I performed these tasks as an accommodation to Mr. Lueken -- good friend and client.  I did not charge Mr. Lueken and his family and, of course, I did not charge B&G.  None of these matters had <u>any</u> relationship with B&G and are completely irrelevant to these proceedings.

22.    The work AKO did for B&G was extensive from the outset, and for some months before we were terminated, became intensive.  AKO initiated three lawsuits on B&G's behalf against insurance companies for losses B&G's offered, AKO also defended B&G in two lawsuits brought by a contractor retained by one of B&G's insurance carriers.

### AKO's Billing of B&G

23.    From the beginning of AKO's representation of B&G in 2006, I, on behalf of AKO, presented monthly invoices to B&G specifying what work was done, the attorneys who had done it, and the resulting time charges as well as disbursements.  I have attached as Exhibit D a calculation by month of the running balances, showing at the close of each month the amount then owed after crediting B&G payments against rendered invoices.

24.    Contrary to B&G's absurd statements in their sworn declarations, B&G knew from those invoices, as well as from my frequent discussions with Mr. Lueken (and at times, the principals of B&G), that I was lead counsel on the

representation and taking the laboring oar in conducting and supervising these litigations -- while Mr. Ellison played an important role of providing his insurance expertise. However, as his and my hours reflect, the day-to-day work was left with me and other members of our team.

25.    B&G was completely satisfied with AKO's representation. I received praise for my and AKO's work from Messrs. Lueken, Bray, and Gillespie. In recognition of and gratitude for B&G's very sizable payments and the volume of work AKO was doing for B&G, in January 2007, I caused AKO to grant B&G an across the board discount of 10% of fees. In a letter to me, Mr. Bray acknowledged the write-offs and complimented both AKO and myself on our work:

> "Mike, I have received you letter of March 2, 2007, whereby, your firm has provided us %10 off all fees for all maters commencing January 1, 2007. I wanted to personally take this time to thank you for all the fine efforts of your firm, as well as, yourself. We appreciate what you have done for us and we enjoy working with you and your fellow associates.
>
> In closing, I would like thank you again for the %10 discount. I look forward to seeing you all in the near future.
>
> Best Regards"

26.    In addition, over the time AKO represented B&G, I made significant, pre-bill write-offs of the time actually billed. The result was a total of some $430,000 written-off to B&G's benefit.

27.    By August 31, 2007, even taking into account the pre-bill write-offs, the outstanding balance owed for time charges and disbursements was $658,272.24. See Exhibit D.

28.    At that time, I received a telephone call from Mr. Lueken, in which he told me that Mr. Bray had specifically asked Mr. Lueken to request that AKO agree to

defer payment of $300,000 in fees from September 2007 due until February 28, 2008, to assist B&G financially during its "slower season."

29.    I discussed this request with the AKO Executive Committee, which authorized the deferral on the condition that B&G bring its account current within 60 days, and pay all ongoing charges within 60 days of invoicing. I relayed this decision to Mr. Lueken in an email on September 28, 2007. Exhibit E, attached hereto.

30.    On September 30, 2007, Mr. Lueken returned to me my September 28 email with the endorsement "Thank you, Harold." *Id.* In a subsequent phone call, Mr. Lueken expressed Mr. Bray's and B&G's gratitude for the deferral.

31.    For whatever relevance it has, the majority of time charges on the B&G representation originated with work done by AKO New York personnel. Even assuming that Mr. Ellison is viewed as stationed primarily in Philadelphia, the time records between us speak volumes: during the time AKO worked for B&G, I billed 2189 hours, while Mr. Ellison billed only 189 hours. See Exhibit C.

### B&G Tries to Raise Capital

32.    As the various litigations in which AKO represented B&G were being litigated, including one, the *Belfor* matter, that was scheduled for trial in late April 2008, the volume of work and the hours devoted to that work, increased significantly. B&G's last significant payments to AKO took place in 2007.

33.    In late 2007, I became aware from my discussions with Mr. Lueken that B&G was trying to raise capital. In early 2008, I had repeated discussions with Mr. Lueken about B&G paying AKO for its work. Mr. Lueken regularly advised me that B&G was trying to raise money and that payments to AKO would be made when such financing was received.

34.    Based upon Mr. Lueken's representations and despite the lack of payment, I agreed for AKO to continue our representation and trial preparation on all the open litigations.

### Mr. Ellison Goes To Reed Smith

35.    In late December 2007/early January 2008, a number of AKO attorneys, including both Mr. Ellison and myself, received offers to join the law firm Reed Smith.  Mr. Ellison elected to join Reed Smith; I elected to stay at AKO.  However, during the transition months of January and February, 2008, the entire team continued to work together on the B&G matters.

36.    Contrary to B&G's declarations, when it became clear that I was staying at AKO and Mr. Ellison was leaving for Reed Smith, I spoke with Mr. Lueken and recommended that Mr. Ellison continue on the "B&G team" (despite his moving to a new firm), as it did not make legal or business sense to bring another "insurance expert" on to the team -- and we were working well together.  I repeatedly said, "if it ain't broke, don't fix it."

37.    Mr. Lueken reported that he was not sure whether Mr. Bray would approve of two large law firms working together, but would check with Mr. Bray. Ultimately, Mr. Bray agreed to have the team as I suggested, with Mr. Ellison at Reed Smith, continuing on the "B&G team."

38.    Thus, despite learning that Mr. Ellison and several associates who had been on the B&G team were going to Reed Smith, B&G determined to retain AKO as counsel.  In fact, in January and February, Maya Cater came to New York to meet with the AKO attorneys who were remaining on the engagement.  In total, Ms. Cater

made at least two trips to New York.  (Ms. Cater submits a declaration with these papers.)

39.     In the final week of March 2008, the week B&G fired AKO, AKO with B&G's local counsel filed five substantive, dispositive motions in the Belfor case. To accuse AKO of "poor performance" in February and March of 2008, is simply incorrect.  That AKO devoted such a large amount of its resources pursuing the various B&G litigations and preparing one case for trial at a time when it was dealing with the stresses of the loss of a substantial minority of its attorneys, demonstrates the devotion with which AKO viewed its obligations to B&G.  I believe it is also highly significant that AKO continued to devote such resources to the representation although AKO had not received a single payment for work already done and invoiced in all of 2008.  the last check we had received – in fact the last check we have received to date – was for $21,799.45, dated Dec. 31, 2007.  As of the start of this year,  the running balance was $857,132.88.  See Exhibit D, annexed hereto.

40.     It is equally important that the Court note that B&G to date has not made any specific objections to any of the outstanding amounts owed.

41.     I submit that it is more than telling that Mr. Ellison has not filed a declaration in support of B&G's motions parroting the other declarations.

42.     I note that Mr. Lueken, in his declaration filed herewith, render as falsehoods other allegations B&G makes in its moving papers.  I suggest that the reality is this:  B&G learned in February 2008 that Mr. Ellison and other AKO lawyers were moving to another firm.  B&G sensed that this provided an opportunity to renege on its financial obligations to AKO -- which was owed significant monies.  B&G then

dishonored its obligation to AKO to pay all its arrears – including the $300,000 that had been deferred from September of 2007 -- at the end of February 2008 and terminated AKO on March 28, 2008.

43.    In addition, as another indication of AKO's good faith, although under New York law AKO possessed a statutory lien on the B&G files, AKO did not assert such lien.  Instead, AKO, despite knowing that it would not be paid without litigation, worked diligently to promptly get B&G and its new in-house counsel various documents and files they had requested.

44.    AKO to this day has been assisting the Reed Smith firm in the transition of all B&G matters to that firm, including providing strategic advice and answering questions – this despite being cheated by B&G out of its fees.  This transition involved the movement of an enormous amount of files, both paper and electronic. AKO intends to add the amount of its transition work to its claim against B&G as it was work that B&G requested and for which B&G obtained substantial benefit.

## The AKO Bills

45.    Below are listed each AKO statement for services rendered sent from AKO to B&G.  These statements are contained in several binders collectively labeled "AKO Bills," and submitted herewith.

1.    Attached at "Tab 1" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG001 matter, in the amount of $329.43, bates stamped AK0000001-5.

2.    Attached at "Tab 2" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG001 matter, in the amount of $35.42, bates stamped AK0000006-10.

3.    Attached at "Tab 3" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG001 matter, in the amount of $35.42, bates stamped AK0000011-15.

4.    Attached at "Tab 4" is a copy of the AKO statement sent to B&G on or about February 2, 2007 for work done on the BG001 matter, in the amount of $1,111.67, bates stamped AK0000016-20.

5.    Attached at "Tab 5" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG001 matter, in the amount of $661.89, bates stamped AK0000021-24.

6.    Attached at "Tab 6" is a copy of the AKO statement sent to B&G on or about April 3, 2008 for work done on the BG002 matter, in the amount of $79,748.33, bates stamped AK0000025-38.

7.    Attached at "Tab 7" is a copy of the AKO statement sent to B&G on or about March 24, 2008 for work done on the BG002 matter, in the amount of $50,435.78, bates stamped AK0000039-48.

8.    Attached at "Tab 8" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG002 matter, in the amount of $79,822.35, bates stamped AK0000049-61.

9.    Attached at "Tab 9" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG002 matter, in the amount of $66,371.86, bates stamped AK0000062-75.

10.    Attached at "Tab 10" is a copy of the AKO statement sent to B&G on or about January 3, 2008 for work done on the BG002 matter, in the amount of $77,682.19, bates stamped AK0000076-90.

11.    Attached at "Tab 11" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG002 matter, in the amount of $82,647.00, bates stamped AK0000091-104.

12.    Attached at "Tab 12" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG002 matter, in the amount of $34,109.80, bates stamped AK0000105-114.

13.    Attached at "Tab 13" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG002 matter, in the amount of $39,213.72, bates stamped AK0000115-124.

14.    Attached at "Tab 14" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG002 matter, in the amount of $53,811.00, bates stamped AK0000125-133.

15.    Attached at "Tab 15" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG002 matter, in the amount of $25,870.35, bates stamped AK0000134-144.

16.    Attached at "Tab 16" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG002 matter, in the amount of $43,308.61, bates stamped AK0000145-157.

17.    Attached at "Tab 17" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG002 matter, in the amount of $77,810.13, bates stamped AK0000158-170.

18.    Attached at "Tab 18" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG002 matter, in the amount of $67,982.95, bates stamped AK0000171-183.

19.    Attached at "Tab 19" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG002 matter, in the amount of $71,544.03, bates stamped AK0000184-204.

20.    Attached at "Tab 20" is a copy of the AKO statement sent to B&G on or about May 2, 2007 for work done on the BG002 matter, in the amount of $60,530.76, bates stamped AK0000205-214.

21.    Attached at "Tab 21" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG002 matter, in the amount of $23,189.09, bates stamped AK0000215-224.

22.    Attached at "Tab 22" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG002 matter, in the amount of $59,785.66, bates stamped AK0000225-237.

23.    Attached at "Tab 23" is a copy of the AKO statement sent to B&G on or about December 1, 2006 for work done on the BG002 matter, in the amount of $314,471.32, bates stamped AK0000238-247.

24.    Attached at "Tab 24" is a copy of the AKO statement sent to B&G on or about December 15, 2006 for work done on the BG002 matter, in the amount of $220,364.32, bates stamped AK0000248-263.

25.    Attached at "Tab 25" is a copy of the AKO statement sent to B&G on or about December 20, 2006 for work done on the BG002 matter, in the amount of $79,302.57, bates stamped AK0000264-283.

26.    Attached at "Tab 26" is a copy of the AKO statement sent to B&G on or about August 31, 2006 for work done on the BG002 matter, in the amount of $211,896.10, bates stamped AK0000284-304.

27.    Attached at "Tab 27" is a copy of the AKO statement sent to B&G on or about July 31, 2006 for work done on the BG002 matter, in the amount of $103,366.49, bates stamped AK0000305-317.

28.    Attached at "Tab 28" is a copy of the AKO statement sent to B&G on or about July 21, 2006 for work done on the BG002 matter, in the amount of $18,622.00, bates stamped AK0000318-323.

29.    Attached at "Tab 29" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG003 matter, in the amount of $2,446.20, bates stamped AK0000324-328.

30.    Attached at "Tab 30" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG003 matter, in the amount of $593.65, bates stamped AK0000329-333.

31.    Attached at "Tab 31" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG003 matter, in the amount of $1,690.61, bates stamped AK0000334-338.

32.    Attached at "Tab 32" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG003 matter, in the amount of $95.63, bates stamped AK0000339-342.

33.    Attached at "Tab 33" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG003 matter, in the amount of $28.44, bates stamped AK0000343-346.

34.    Attached at "Tab 34" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG003 matter, in the amount of $6,101.27, bates stamped AK0000347-351.

35.    Attached at "Tab 35" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG003 matter, in the amount of $241.87, bates stamped AK0000352-356.

36.   Attached at "Tab 36" is a copy of the AKO statement sent to B&G on or about December 1, 2006 for work done on the BG003 matter, in the amount of $1,498.60, bates stamped AK0000357-361.

37.   Attached at "Tab 37" is a copy of the AKO statement sent to B&G on or about April 3, 2008 for work done on the BG004 matter, in the amount of $42,689.10, bates stamped AK0000362-370.

38.   Attached at "Tab 38" is a copy of the AKO statement sent to B&G on or about March 24, 2008 for work done on the BG004 matter, in the amount of $69,181.58, bates stamped AK0000371-381.

39.   Attached at "Tab 39" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG004 matter, in the amount of $15,288.45, bates stamped AK0000382-388.

40.   Attached at "Tab 40" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG004 matter, in the amount of $8,911.09, bates stamped AK0000389-394.

41.   Attached at "Tab 41" is a copy of the AKO statement sent to B&G on or about January 1, 2007 for work done on the BG004 matter, in the amount of $15,380.62, bates stamped AK0000395-402.

42.   Attached at "Tab 42" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG004 matter, in the amount of $17,999.02, bates stamped AK0000403-409.

43.   Attached at "Tab 43" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG004 matter, in the amount of $13,528.79, bates stamped AK0000410-415.

44.   Attached at "Tab 44" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG004 matter, in the amount of $19,219.01, bates stamped AK0000416-422.

45.   Attached at "Tab 45" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG004 matter, in the amount of $3,437.55, bates stamped AK0000423-427.

46.   Attached at "Tab 46" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG004 matter, in the amount of $11,765.92, bates stamped AK0000428-433.

47.    Attached at "Tab 47" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG004 matter, in the amount of $17,165.63, bates stamped AK0000434-441.

48.    Attached at "Tab 48" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG004 matter, in the amount of $3,503.65, bates stamped AK0000442-447.

49.    Attached at "Tab 49" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG004 matter, in the amount of $12,460.94, bates stamped AK0000448-453.

50.    Attached at "Tab 50" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG004 matter, in the amount of $13,663.75, bates stamped AK0000454-459.

51.    Attached at "Tab 51" is a copy of the AKO statement sent to B&G on or about March 3, 2007 for work done on the BG004 matter, in the amount of $5,140.34, bates stamped AK0000460-465.

52.    Attached at "Tab 52" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG004 matter, in the amount of $17,161.01, bates stamped AK0000446-473.

53.    Attached at "Tab 53" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG004 matter, in the amount of $11,453.00, bates stamped AK0000474-480.

54.    Attached at "Tab 54" is a copy of the AKO statement sent to B&G on or about December 1, 2006 for work done on the BG004 matter, in the amount of $31,674.32, bates stamped AK0000481-489.

55.    Attached at "Tab 55" is a copy of the AKO statement sent to B&G on or about December 15, 2006 for work done on the BG004 matter, in the amount of $48,821.82, bates stamped AK0000490-500.

56.    Attached at "Tab 56" is a copy of the AKO statement sent to B&G on or about December 20, 2006 for work done on the BG004 matter, in the amount of $22,196.50, bates stamped AK0000501-506.

57.    Attached at "Tab 57" is a copy of the AKO statement sent to B&G on or about April 3, 2008 for work done on the BG005 matter, in the amount of $177,543.42, bates stamped AK0000507-532.

58.    Attached at "Tab 58" is a copy of the AKO statement sent to B&G on or about March 24, 2008 for work done on the BG005 matter, in the amount of $263,615.18, bates stamped AK0000533-561.

59.    Attached at "Tab 59" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG005 matter, in the amount of $144,577.34, bates stamped AK0000562-588.

60.    Attached at "Tab 60" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG005 matter, in the amount of $114,031.78, bates stamped AK0000589-609.

61.    Attached at "Tab 61" is a copy of the AKO statement sent to B&G on or about January 3, 2008 for work done on the BG005 matter, in the amount of $108,773.87, bates stamped AK0000610-629.

62.    Attached at "Tab 62" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG005 matter, in the amount of $124,603.15, bates stamped AK0000630-654.

63.    Attached at "Tab 63" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG005 matter, in the amount of $68,264.19, bates stamped AK0000655-674.

64.    Attached at "Tab 64" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG005 matter, in the amount of $97,129.79, bates stamped AK0000675-691.

65.    Attached at "Tab 65" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG005 matter, in the amount of $122,775.70, bates stamped AK0000692-705.

66.    Attached at "Tab 66" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG005 matter, in the amount of $163,295.61, bates stamped AK0000706-737.

67.    Attached at "Tab 67" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG005 matter, in the amount of $79,546.83, bates stamped AK0000738-755.

68.    Attached at "Tab 68" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG005 matter, in the amount of $108,125.23, bates stamped AK0000756-772.

69.   Attached at "Tab 69" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG005 matter, in the amount of $82,275.68, bates stamped AK0000773-785.

70.   Attached at "Tab 70" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG005 matter, in the amount of $98,726.08, bates stamped AK0000786-799.

71.   Attached at "Tab 71" is a copy of the AKO statement sent to B&G on or about March 2, 2007 for work done on the BG005 matter, in the amount of $76,489.26, bates stamped AK0000800-809.

72.   Attached at "Tab 72" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG005 matter, in the amount of $32,754.43, bates stamped AK0000810-819.

73.   Attached at "Tab 73" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG005 matter, in the amount of $47,114.96, bates stamped AK0000820-829.

74.   Attached at "Tab 74" is a copy of the AKO statement sent to B&G on or about December 1, 2006 for work done on the BG005 matter, in the amount of $46,512.54, bates stamped AK0000830-838.

75.   Attached at "Tab 75" is a copy of the AKO statement sent to B&G on or about December 15, 2006 for work done on the BG005 matter, in the amount of $66,165.00, bates stamped AK0000839-857.

76.   Attached at "Tab 76" is a copy of the AKO statement sent to B&G on or about December 20, 2006 for work done on the BG005 matter, in the amount of $50,274.00, bates stamped AK0000858-868.

77.   Attached at "Tab 77" is a copy of the AKO statement sent to B&G on or about February 5, 2007 for work done on the BG006 matter, in the amount of $106.50, bates stamped AK0000869-872.

78.   Attached at "Tab 78" is a copy of the AKO statement sent to B&G on or about January16, 2007 for work done on the BG006 matter, in the amount of $150.00, bates stamped AK0000873-876.

79.   Attached at "Tab 79" is a copy of the AKO statement sent to B&G on or about December 1, 2006 for work done on the BG006 matter, in the amount of $5,316.00, bates stamped AK0000877-881.

80. Attached at "Tab 80" is a copy of the AKO statement sent to B&G on or about December 12, 2006 for work done on the BG006 matter, in the amount of $12,483.00, bates stamped AK0000882-891.

81. Attached at "Tab 81" is a copy of the AKO statement sent to B&G on or about December 20, 2006 for work done on the BG006 matter, in the amount of $8,889.00, bates stamped AK0000892-899.

82. Attached at "Tab 82" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG007 matter, in the amount of $649.75, bates stamped AK0000900-903.

83. Attached at "Tab 83" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG007 matter, in the amount of $2,062.00, bates stamped AK0000904-907.

84. Attached at "Tab 84" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG007 matter, in the amount of $2,212.50, bates stamped AK0000908-911.

85. Attached at "Tab 85" is a copy of the AKO statement sent to B&G on or about December 15, 2006 for work done on the BG007 matter, in the amount of $12,446.50, bates stamped AK0000912-918.

86. Attached at "Tab 86" is a copy of the AKO statement sent to B&G on or about December 1, 2006 for work done on the BG007 matter, in the amount of $11,646.50, bates stamped AK0000919-924.

87. Attached at "Tab 87" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG007 matter, in the amount of $6,288.50, bates stamped AK0000925-929.

88. Attached at "Tab 88" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG007 matter, in the amount of $379.80, bates stamped AK0000930-933.

89. Attached at "Tab 89" is a copy of the AKO statement sent to B&G on or about April 3, 2008 for work done on the BG008 matter, in the amount of $35,611.40, bates stamped AK0000934-940.

90. Attached at "Tab 90" is a copy of the AKO statement sent to B&G on or about March 24, 2008 for work done on the BG008 matter, in the amount of $20,638.42, bates stamped AK0000941-946.

91. Attached at "Tab 91" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG008 matter, in the amount of $1,624.10, bates stamped AK0000947-951.

92. Attached at "Tab 92" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG008 matter, in the amount of $3,889.47, bates stamped AK0000952-956.

93. Attached at "Tab 93" is a copy of the AKO statement sent to B&G on or about January 3, 2008 for work done on the BG008 matter, in the amount of $3,047.25, bates stamped AK0000957-962.

94. Attached at "Tab 94" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG008 matter, in the amount of $5,818.92, bates stamped AK0000963-969.

95. Attached at "Tab 95" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG008 matter, in the amount of $1,295.72, bates stamped AK0000970-974.

96. Attached at "Tab 96" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG008 matter, in the amount of $1,803.60, bates stamped AK0000975-978.

97. Attached at "Tab 97" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG008 matter, in the amount of $384.30, bates stamped AK0000979-982.

98. Attached at "Tab 98" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG008 matter, in the amount of $781.70, bates stamped AK0000983-986.

99. Attached at "Tab 99" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG008 matter, in the amount of $621.11, bates stamped AK0000987-991.

100. Attached at "Tab 100" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG008 matter, in the amount of $1,476.05, bates stamped AK0000992-996.

101.    Attached at "Tab 101" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG008 matter, in the amount of $3,030.52, bates stamped AK0000997-1000.

102.    Attached at "Tab 102" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG008 matter, in the amount of $1,487.25, bates stamped AK0001001-1004.

103.    Attached at "Tab 103" is a copy of the AKO statement sent to B&G on or about March 2, 2007 for work done on the BG007 matter, in the amount of $1,071.45, bates stamped AK0000005-1011.

104.    Attached at "Tab 104" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG007 matter, in the amount of $649.75, bates stamped AK0001012-1015.

105.    Attached at "Tab 105" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG007 matter, in the amount of $2,062.06, bates stamped AK0001016-1019.

106.    Attached at "Tab 106" is a copy of the AKO statement sent to B&G on or about December 1, 2007 for work done on the BG007 matter, in the amount of $11,646.50, bates stamped AK0001020-1025.

107.    Attached at "Tab 107" is a copy of the AKO statement sent to B&G on or about December 15, 2007 for work done on the BG007 matter, in the amount of $12,446.50, bates stamped AK0001026-1030.

108.    Attached at "Tab 108" is a copy of the AKO statement sent to B&G on or about April 3, 2008 for work done on the BG009 matter, in the amount of $27,275.40, bates stamped AK0001031-1035.

109.    Attached at "Tab 109" is a copy of the AKO statement sent to B&G on or about March 24, 2008 for work done on the BG009 matter, in the amount of $788.40, bates stamped AK0001036-1039.

110.    Attached at "Tab 110" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG009 matter, in the amount of $1,114.65, bates stamped AK0001040-1043.

111.    Attached at "Tab 111" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG009 matter, in the amount of $384.30, bates stamped AK0001044-1047.

112.    Attached at "Tab 112" is a copy of the AKO statement sent to B&G on or about January 3, 2008 for work done on the BG009 matter, in the amount of $12,212.91, bates stamped AK0001048-1054.

113.    Attached at "Tab 113" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG009 matter, in the amount of $11,777.30, bates stamped AK0001055-1061.

114.    Attached at "Tab 114" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG009 matter, in the amount of $1,020.99, bates stamped AK0001062-1066.

115.    Attached at "Tab 115" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG009 matter, in the amount of $1,619.55, bates stamped AK0001067-1070.

116.    Attached at "Tab 116" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG009 matter, in the amount of $109.80, bates stamped AK0001071-1074.

117.    Attached at "Tab 117" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG009 matter, in the amount of $1,024.96, bates stamped AK0001075-1079.

118.    Attached at "Tab 118" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG009 matter, in the amount of $9,126.75, bates stamped AK0001080-1085.

119.    Attached at "Tab 119" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG009 matter, in the amount of $8,197.10, bates stamped AK0001086-1090.

120.    Attached at "Tab 120" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG009 matter, in the amount of $379.80, bates stamped AK0001091-1094.

121.    Attached at "Tab 121" is a copy of the AKO statement sent to B&G on or about March 2, 2007 for work done on the BG009 matter, in the amount of $4,585.05, bates stamped AK0001095-1098.

122.    Attached at "Tab 122" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG009 matter, in the amount of $9,198.77, bates stamped AK0001099-1105.

123.    Attached at "Tab 123" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG007 matter, in the amount of $6,288.50, bates stamped AK0001106-1110.

124.    Attached at "Tab 124" is a copy of the AKO statement sent to B&G on or about March 3, 2008 for work done on the BG010 matter, in the amount of $14,589.07, bates stamped AK0001111-1116.

125.    Attached at "Tab 125" is a copy of the AKO statement sent to B&G on or about March 24, 2008 for work done on the BG010 matter, in the amount of $11,564.10, bates stamped AK0001117-1121.

126.    Attached at "Tab 126" is a copy of the AKO statement sent to B&G on or about February 25, 2007 for work done on the BG010 matter, in the amount of $427.05, bates stamped AK0001111-1125.

127.    Attached at "Tab 127" is a copy of the AKO statement sent to B&G on or about February 25, 2008 for work done on the BG010 matter, in the amount of $933.79, bates stamped AK0001126-1130.

128.    Attached at "Tab 128" is a copy of the AKO statement sent to B&G on or about January 3, 2008 for work done on the BG010 matter, in the amount of $6,823.26, bates stamped AK0001131-1136.

129.    Attached at "Tab 129" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG010 matter, in the amount of $3,376.35, bates stamped AK0001137-1141.

130.    Attached at "Tab 130" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG010 matter, in the amount of $3,371.05, bates stamped AK0001142-1146.

131.    Attached at "Tab 131" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG010 matter, in the amount of $416.25, bates stamped AK0001147-1151.

132.    Attached at "Tab 132" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG010 matter, in the amount of $521.55, bates stamped AK0001152-1155.

133.    Attached at "Tab 133" is a copy of the AKO statement sent to B&G on or about August 17, 2007 for work done on the BG010 matter, in the amount of $494.85, bates stamped AK0001156-1160.

134.    Attached at "Tab 134" is a copy of the AKO statement sent to B&G on or about July 3, 2007 for work done on the BG010 matter, in the amount of $5,820.20, bates stamped AK0001161-1165.

135.    Attached at "Tab 135" is a copy of the AKO statement sent to B&G on or about May 17, 2007 for work done on the BG010 matter, in the amount of $1,408.50, bates stamped AK0001166-1169.

136.    Attached at "Tab 136" is a copy of the AKO statement sent to B&G on or about April 26, 2007 for work done on the BG010 matter, in the amount of $2,378.67, bates stamped AK0001170-1174.

137.    Attached at "Tab 137" is a copy of the AKO statement sent to B&G on or about April 4, 2007 for work done on the BG010 matter, in the amount of $3,478.95, bates stamped AK0001175-1178.

138.    Attached at "Tab 138" is a copy of the AKO statement sent to B&G on or about March 2, 2007 for work done on the BG010 matter, in the amount of $881.65, bates stamped AK0001179-1183.

139.    Attached at "Tab 139" is a copy of the AKO statement sent to B&G on or about February 6, 2007 for work done on the BG010 matter, in the amount of $2,329.50, bates stamped AK0001184-1189.

140.    Attached at "Tab 140" is a copy of the AKO statement sent to B&G on or about January 16, 2007 for work done on the BG010 matter, in the amount of $2,212.50, bates stamped AK0001190-1193.

141.    Attached at "Tab 141" is a copy of the AKO statement sent to B&G on or about November 9, 2007 for work done on the BG011 matter, in the amount of $54.90, bates stamped AK0001194-1195.

142.    Attached at "Tab 142" is a copy of the AKO statement sent to B&G on or about October 30, 2007 for work done on the BG011 matter, in the amount of $2,628.90, bates stamped AK0001196-1199.

143.    Attached at "Tab 143" is a copy of the AKO statement sent to B&G on or about September 28, 2007 for work done on the BG011 matter, in the amount of $1,317.60, bates stamped AK0001200-1204.

144.    Attached at "Tab 144" is a copy of the AKO statement sent to B&G on or about September 5, 2007 for work done on the BG011 matter, in the amount of $4,232.25, bates stamped AK0001205-1209.

46.    Also submitted herewith in a binder labeled "Checks" are copies of the checks with which B&G made payments to AKO, including in most cases the invoice numbers that B&G wished the checks credited against.  These checks were written on accounts of the following B&G entities:

Bray & Gillespie Management LLC d/b/a Ocean Waters management
Bray & Gillespie Delaware 1 LP d/b/a Treasure Island Resort
B&G XI dba Holiday Inn Westbank
422 N. Atlantic Ave. Operating Account
Bray & Gillespie IX, LLC, d/b/a Surfside Resort
Bray & Gillespie III LLC d/b/a The Plaza Resort & Spa
Bray & Gillespie X, LLC
Bray& Gillespie V LLC d/b/a Plaza Ocean Club
Bray & Gillespie III LP d/b/a Beachcomber Inn
Bray & Gillespie La Playa d/b/a La Playa Resort
Bray & Gillespie XIV d/b/a Conch House
Bray & Gillespie VI LLC d/b/a Acapulco Inn
Bray & Gillespie VIII LLC d/b/a Bermuda House

## Conclusion

47.    As demonstrated in the accompanying memoranda of law, there is no merit to B&G's argument that this court lacks personal jurisdiction (or that the venue is improper) to adjudicate AKO's claims in this court.  As regards B&G's alternative request, that the case be transferred to the District Court for the Middle District of Florida, I point out that in addition to the numerous contacts this case and B&G have with New York, the essential witnesses to establish our account stated, the amounts due under contract for AKO's services, the representation undertaken by AKO after B&G promised that AKO would be paid its deferred charges, and the reasonableness both of the fees and the time spent in the representation, are overwhelmingly in New York or in Philadelphia.  According to the AKO time records, New York personnel conducted at least one-half of the work done for B&G.  Exhibit C.  All of the work

product and records are in New York.  AKO chose the New York forum as it was

indicated in the Retainer Agreement.

48.    At the heart of the issue is the fact that B&G elected to retain a firm headquartered in New York to handle certain Florida litigations and to provide general legal advice.  Since B&G decided that the advantages of retaining AKO outweighed any concerns favoring retention of Florida counsel, there is no reason to vary that decision now.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York on June 27, 2008.

_____
                                         Michael J. Lane

# EXHIBIT A

# ANDERSON KILL & OLICK, P.C.

Attorneys and Counsellors at Law

1251 AVENUE OF THE AMERICAS ■ NEW YORK, NY 10020-1182
TELEPHONE: 212-278-1000 ■ FAX: 212-278-1733
www.andersonkill.com

Michael J. Lane
(212) 278-1568
mlane@andersonkill.com

May 30, 2006

**BY FACSIMILE AND FIRST CLASS MAIL**

Harold W. Lueken, Esq.
General Counsel
Gray & Gillespie
600 North Atlantic Avenue
Daytona Beach, Florida 32118

Re:    Lexington Insurance

Dear Harold:

The rules of the Appellate Divisions of the Supreme Court require that there be a written Letter of Engagement at the beginning of an attorney-client relationship.

This letter confirms that Bray & Gillespie ("B&G" or "you") wishes to retain our firm to represent you in connection with your dispute with Lexington Insurance (and, possibly others) in connection with losses B&G suffered in 2004, from property damage to various hotels you own caused by hurricanes.

The fees to be charged will be based on our firm's hourly rates. My normal hourly rate is $425 per hour. The rates of other attorneys in the firm range from $175 per hour to $700 per hour, depending on the seniority of the attorney. Paralegal rates are lower. We will bill you on a monthly basis for time charges and disbursements, and you agree to pay those bills promptly.

Disbursements consist of such items as long-distance telephone, facsimile, photocopy, messenger service, travel, lodging, secretarial overtime, obtaining copies of documents from governmental authorities, filing fees, recording charges, computerized legal research and other items of like import. We expect that you will either pay directly or reimburse us for such costs. If such costs may be calculated beforehand and appear to be substantial, we may ask you to advance us those sums before we expend them, or to reimburse the vendor directly.

NYDOCS1-822490.1
NEW YORK, NY ■ CHICAGO, IL ■ NEWARK, NJ ■ PHILADELPHIA, PA ■ WASHINGTON, DC

ANDERSON KILL & OLICK, P.C.

May 30, 2006
Page 2

You also agree that we will have the right to terminate the engagement with you at any time upon reasonable advance notice, including without limitation, if our statements for professional services rendered and costs and expenses incurred are not paid promptly. You shall also have a right to terminate the engagement at any time.

In the event that a dispute arises between us relating to our fees, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator, a copy of which will be provided to you upon request.

If you agree to the terms of this retainer letter, kindly sign a copy of this letter below and return it to me by facsimile and in the enclosed stamped, self-addressed envelope.

Sincerely yours,

ANDERSON KILL & OLICK, P.C.

By:_____
Michael J. Lane

MJL:hvc

cc:    Records Department

Agreed to:

_____
Harold W. Lueken, Esq.
Bray & Gillespie

NYDOCS1-822490.1

# EXHIBIT B

**Lane, Michael J.**

| | |
|---|---|
| **From:** | Bartelemucci, Lawrence J. |
| **Sent:** | Wednesday, March 26, 2008 11:04 AM |
| **To:** | Lane, Michael J. |
| **Subject:** | RE: RCA Rules, Part 137 |

Will do.

Lawrence J. Bartelemucci, Esq.
Anderson Kill & Olick, P.C.
Phone: (212) 278.1883
Fax: (212) 278.1733


-----Original Message-----
From: Lane, Michael J.
Sent: Wednesday, March 26, 2008 11:01 AM
To: Bartelemucci, Lawrence J.
Subject: Fw: RCA Rules, Part 137


Pls get and send asap

----- Original Message -----
From: Scott Elder <selder@oceanwatersmanagement.com>
To: Lane, Michael J.
Cc: snalley@oceanwatersmanagement.com <snalley@oceanwatersmanagement.com>;
asims@oceanwatersmanagement.com <asims@oceanwatersmanagement.com>; 'Maya Cater'
<mcater@oceanwatersmanagement.com>; bdelvalle@oceanwatersmanagement.com
<bdelvalle@oceanwatersmanagement.com>
Sent: Wed Mar 26 10:08:09 2008
Subject: RCA Rules, Part 137

Mike,


I hope this finds you well. Please email me a copy of Part 137 of the Rules of the Chief
Administrator, pursuant to our letter of engagement with your firm. Thanks.



Regards,



Scot M. Elder, Esq.

Ocean Waters Investments

501 North Atlantic Ave

Daytona Beach, FL 32118

Direct: 386-944-4278

Fax: 386-267-0326

Email: selder@oceanwatersmanagement.com

### Lane, Michael J.

**From:**    Bartelemucci, Lawrence J.
**Sent:**    Wednesday, March 26, 2008 11:42 AM
**To:**    'selder@oceanwatersmanagement.com'
**Cc:**    Lane, Michael J.
**Subject:** Part 137

Mr. Elder:  Mike Lane asked me to forward the attached Part 137 of the Rules of the Chief Administrator.  Please let me know if you need anything else.


*Lawrence J. Bartelemucci, Esq.*
*Anderson Kill & Olick, P.C.*
*1251 Avenue of the Americas*
*New York, New York 10020*
*Phone: (212) 278.1883*
*Fax: (212) 278.1733*



# New York State
# Fee Dispute Resolution Program

*Part 137 of Title 22 of the Official Compilation of Codes, Rules and Regulations of the State of New York*

Website: www.nycourts.gov/admin/feedispute • E-mail: feedispute@courts.state.ny.us

Toll-free phone: 1-877-FEES-137 (1-877-333-7137)

## §137.0 Scope of Program

This Part establishes the New York State Fee Dispute Resolution Program, which provides for the informal and expeditious resolution of fee disputes between attorneys and clients through arbitration and mediation. In accordance with the procedures for arbitration, arbitrators shall determine the reasonableness of fees for professional services, including costs, taking into account all relevant facts and circumstances. Mediation of fee disputes, where available, is strongly encouraged.

## §137.1 Application

(a) This Part shall apply where representation has commenced on or after January 1, 2002, to all attorneys admitted to the bar of the State of New York who undertake to represent a client in any civil matter.

(b) This Part shall not apply to any of the following:

(1) representation in criminal matters;

(2) amounts in dispute involving a sum of less than $1000 or more than $50,000, except that an arbitral body may hear disputes involving other amounts if the parties have consented;

(3) claims involving substantial legal questions, including professional malpractice or misconduct;

(4) claims against an attorney for damages or affirmative relief other than adjustment of the fee;

(5) disputes where the fee to be paid by the client has been determined pursuant to statute or rule and allowed as of right by a court; or where the fee has been determined pursuant to a court order;

(6) disputes where no attorney's services have been rendered for more than two years;

(7) disputes where the attorney is admitted to practice in another jurisdiction and maintains no office in the State of New York, or where no material portion of the services was rendered in New York;

(8) disputes where the request for arbitration is made by a person who is not the client of the attorney or the legal representative of the client.

## §137.2 General

(a) In the event of a fee dispute between attorney and client, whether or not the attorney already has received some or all of the fee in dispute, the client may seek to resolve the dispute by arbitration under this Part. Arbitration under this Part shall be mandatory for an attorney if requested by a client, and the arbitration award shall be final and binding unless de novo review is sought as provided in section 137.8.

(b) The client may consent in advance to submit fee disputes to arbitration under this Part. Such consent shall be stated in a retainer agreement or other writing that specifies that the client has read the official written instructions and procedures for Part 137, and that the client agrees to resolve fee disputes under this Part.

(c) The attorney and client may consent in advance to arbitration pursuant to this Part that is final and binding upon the parties and not subject to de novo review. Such consent shall be in writing in a form prescribed by the Board of Governors.

(d) The attorney and client may consent in advance to submit fee disputes for final and binding arbitration to an arbitral forum other than an arbitral body created by this Part. Such consent shall be in writing in a form prescribed by the Board of Governors. Arbitration in that arbitral forum shall be governed by the rules and procedures of that forum and shall not be subject to this Part.

## §137.3 Board of Governors

(a) There shall be a Board of Governors of the New York State Fee Dispute Resolution Program.

(b) The Board of Governors shall consist of 18 members, to be designated from the following: 12 members of the bar of the State of New York and six members of the public who are not lawyers. Members of the bar may include judges and justices of the New York State Unified Court System.

(1) The members from the bar shall be appointed as follows: four by the Chief Judge from the

membership of statewide bar associations and two each by the Presiding Justices of the Appellate Divisions.

(2) The public members shall be appointed as follows: two by the Chief Judge and one each by the Presiding Justices of the Appellate Divisions.

Appointing officials shall give consideration to appointees who have some background in alternative dispute resolution.

(c) The Chief Judge shall designate the chairperson.

(d) Board members shall serve for terms of three years and shall be eligible for reappointment for one additional term. The initial terms of service shall be designated by the Chief Judge such that six members serve one-year terms, six members serve two-year terms, and six members serve three-year terms. A person appointed to fill a vacancy occurring other than by expiration of a term of office shall be appointed for the unexpired term of the member he or she succeeds.

(e) Eleven members of the Board of Governors shall constitute a quorum. Decisions shall be made by a majority of the quorum.

(f) Members of the Board of Governors shall serve without compensation but shall be reimbursed for their reasonable, actual and direct expenses incurred in furtherance of their official duties.

(g) The Board of Governors, with the approval of the four Presiding Justices of the Appellate Divisions, shall adopt such guidelines and standards as may be necessary and appropriate for the operation of programs under this Part, including, but not limited to: accrediting arbitral bodies to provide fee dispute resolution services under this Part; prescribing standards regarding the

training and qualifications of arbitrators; monitoring the operation and performance of arbitration programs to insure their conformance with the guidelines and standards established by this Part and by the Board of Governors; and submission by arbitral bodies of annual reports in writing to the Board of Governors.

(h) The Board of Governors shall submit to the Administrative Board of the Courts an annual report in such form as the Administrative Board shall require.

§137.4  Arbitral Bodies
(a) A fee dispute resolution program recommended by the Board of Governors, and approved by the Presiding Justice of the Appellate Division in the judicial department where the program is established, shall be established and administered in each county or in a combination of counties. Each program shall be established and administered by a local bar association (the "arbitral body") to the extent practicable. The New York State Bar Association, the Unified Court System through the District Administrative Judges, or such other entity as the Board of Governors may recommend also may be designated as an arbitral body in a fee dispute resolution program approved pursuant to this Part.

(b) Each arbitral body shall:

(1) establish written instructions and procedures for administering the program, subject to the approval of the Board of Governors and consistent with this Part. The procedures shall include a process for selecting and assigning arbitrators to hear and determine the fee disputes covered by this Part. Arbitral bodies are strongly encouraged to include nonlawyer members of the public in any pool of arbitrators that will be used for the designation of multi-member arbitrator panels.

(2) require that arbitrators file a written oath or affirmation to faithfully and fairly arbitrate all disputes that come before them.

(3) be responsible for the daily administration of the arbitration program and maintain all necessary files, records, information and documentation required for purposes of the operation of the program, in accordance with directives and procedures established by the Board of Governors.

(4) prepare an annual report for the Board of Governors containing a statistical synopsis of fee dispute resolution activity and such other data as the Board shall prescribe.

(5) designate one or more persons to administer the program and serve as a liaison to the public, the bar, the Board of Governors and the grievance committees of the Appellate Division.

§137.5  Venue
A fee dispute shall be heard by the arbitral body handling disputes in the county in which the majority of the legal services were performed. For good cause shown, a dispute may be transferred from one arbitral body to another. The Board of Governors shall resolve any disputes between arbitral bodies over venue.

§137.6  Arbitration Procedure
(a) (1) Except as set forth in paragraph (2), where the attorney and client cannot agree as to the attorney's fee, the attorney shall forward a written notice to the client, entitled "Notice of Client's Right to Arbitrate," by certified mail or by personal service. The notice (i) shall be in a form approved by the Board of Governors; (ii) shall contain a statement of the client's right to arbitrate; (iii) shall advise that the client has 30 days from receipt of the notice in which to elect to resolve the dispute under this Part; (iv)

shall be accompanied by the written instructions and procedures for the arbitral body having jurisdiction over the fee dispute, which explain how to commence a fee arbitration proceeding; and (v) shall be accompanied by a copy of the "request for arbitration" form necessary to commence the arbitration proceeding.

(2) Where the client has consented in advance to submit fee disputes to arbitration as set forth in subdivisions (b) and (c) of section 137.2 of this Part, and where the attorney and client cannot agree as to the attorney's fee, the attorney shall forward to the client, by certified mail or by personal service, a copy of the "request for arbitration" form necessary to commence the arbitration proceeding along with such notice and instructions as shall be required by the rules and guidelines of the Board of Governors, and the provisions of subdivision (b) of this section shall not apply.

(b) If the attorney forwards to the client by certified mail or personal service a notice of the client's right to arbitrate, and the client does not file a request for arbitration within 30 days after the notice was received or served, the attorney may commence an action in a court of competent jurisdiction to recover the fee and the client no longer shall have the right to request arbitration pursuant to this Part with respect to the fee dispute at issue. An attorney who institutes an action to recover a fee must allege in the complaint (i) that the client received notice under this Part of the client's right to pursue arbitration and did not file a timely request for arbitration or (ii) that the dispute is not otherwise covered by this Part.

(c) In the event the client determines to pursue arbitration on the client's own initiative, the client may directly contact the arbitral body having jurisdiction over the fee dispute. Alternatively, the client may contact the attorney, who shall be under an obligation to refer the client to the arbitral body having jurisdiction over the dispute. The arbitral body then shall forward to the client the appropriate papers set forth in subdivision (a) necessary for commencement of the arbitration.

(d) If the client elects to submit the dispute to arbitration, the client shall file the "request for arbitration form" with the appropriate arbitral body, and the arbitral body shall mail a copy of the "request for arbitration" to the named attorney together with an "attorney fee response" to be completed by the attorney and returned to the arbitral body within 15 days of mailing. The attorney shall include with the "attorney fee response" a certification that a copy of the response was served upon the client.

(e) Upon receipt of the attorney's response, the arbitral body shall designate the arbitrator or arbitrators who will hear the dispute and shall expeditiously schedule a hearing. The parties must receive at least 15 days notice in writing of the time and place of the hearing and of the identity of the arbitrator or arbitrators.

(f) Either party may request the removal of an arbitrator based upon the arbitrator's personal or professional relationship to a party or counsel. A request for removal must be made to the arbitral body no later than five days prior to the scheduled date of the hearing. The arbitral body shall have the final decision concerning the removal of an arbitrator.

(g) The client may not withdraw from the process after the arbitral body has received the "attorney fee response." If the client seeks to withdraw at any time thereafter, the arbitration will proceed as scheduled whether or not the client appears, and a decision will be made on the basis of the evidence presented.

(h) If the attorney without good cause fails to respond to a request for arbitration or otherwise does not participate in the arbitration, the arbitration will proceed as scheduled and a decision will be made on the basis of the evidence presented.

(i) Any party may participate in the arbitration hearing without a personal appearance by submitting to the arbitrator testimony and exhibits by written declaration under penalty of perjury.

§137.7  Arbitration Hearing
(a) Arbitrators shall have the power to:
(1) take and hear evidence pertaining to the proceeding;
(2) administer oaths and affirmations; and
(3) compel, by subpoena, the attendance of witnesses and the production of books, papers and documents pertaining to the proceeding.

(b) The rules of evidence need not be observed at the hearing.

(c) Either party, at his or her own expense, may be represented by counsel.

(d) The burden shall be on the attorney to prove the reasonableness of the fee by a preponderance of the evidence and to present documentation of the work performed and the billing history. The client may then present his or her account of the services rendered and time expended. Witnesses may be called by the parties. The client shall have the right of final reply.

(e) Any party may provide for a stenographic or other record at the party's expense. Any other party to the arbitration shall be entitled to a copy of said record upon written request and payment of the expense thereof.

(f) The arbitration award shall be issued no later than 30 days after the date of the hearing. Arbitration awards shall be in writing and shall specify the bases for the determination. Except as set forth in section 137.8, all arbitration awards shall be final and binding.

(g) Should the arbitrator or arbitral body become aware of evidence of professional misconduct as a result of the fee dispute resolution process, that arbitrator or body shall refer such evidence to the appropriate grievance committee of the Appellate Division for appropriate action.

(h) In any arbitration conducted under this Part, an arbitrator shall have the same immunity that attaches in judicial proceedings.

## §137.8  De Novo Review

(a) A party aggrieved by the arbitration award may commence an action on the merits of the fee dispute in a court of competent jurisdiction within 30 days after the arbitration award has been mailed. If no action is commenced within 30 days of the mailing of the arbitration award, the award shall become final and binding.

(b) Any party who fails to participate in the hearing shall not be entitled to seek de novo review absent good cause for such failure to participate.

(c) Arbitrators shall not be called as witnesses nor shall the arbitration award be admitted in evidence at the trial de novo.

## §137.9  Filing Fees

Upon application to the Board of Governors, and approval by the Presiding Justice of the Appellate Division in the judicial department where the arbitral program is established, an arbitral body may require payment by the parties of a filing fee. The filing fee shall be reasonably related to the cost of providing the service and shall not be in such an amount as to discourage use of the program.

## §137.10  Confidentiality

All proceedings and hearings commenced and conducted in accordance with this Part, including all papers in the arbitration case file, shall be confidential, except to the extent necessary to take ancillary legal action with respect to a fee matter.

## §137.11  Failure to Participate in Arbitration

All attorneys are required to participate in the arbitration program established by this Part upon the filing of a request for arbitration by a client in conformance with these rules. An attorney who without good cause fails to participate in the arbitration process shall be referred to the appropriate grievance committee of the Appellate Division for appropriate action.

## §137.12  Mediation

(a) Arbitral bodies are strongly encouraged to offer mediation services as part of a mediation program approved by the Board of Governors. The mediation program shall permit arbitration pursuant to this Part in the event the mediation does not resolve the fee dispute.

(b) All mediation proceedings and all settlement discussions and offers of settlement are confidential and may not be disclosed in any subsequent arbitration.

EXHIBIT C

Time Recap Summary by TimekeeperLocation And Timekeeper [100317 - BRAY & GILLESPIE]
Currency Code:  6/13/2008 3:06:34 PM

| Timekeeper | Work Hours | Work Amount | Bill Hours | Bill Amount | Description | Description |
|---|---|---|---|---|---|---|
| 01191 | 112.10 | 48763.50 | 100.89 | 43887.15 | NEW YORK | Lawrence J Bartelemucci |
| 01380 | 110.70 | 48154.50 | 99.63 | 43339.05 | NEW YORK | Stanley A Bowker |
| 01830 | 5.10 | 3060.00 | 5.10 | 3060.00 | NEW YORK | John H Doyle, III |
| 02378 | 76.50 | 39780.00 | 68.85 | 35802.00 | NEW YORK | Joshua G Gold |
| 02810 | 2.10 | 1247.50 | 1.94 | 1151.50 | NEW YORK | R M Keenan |
| 03001 | 2363.20 | 1160790.50 | 2189.67 | 1072196.25 | NEW YORK | Michael J Lane |
| 03218 | 56.50 | 22317.50 | 47.43 | 18734.85 | NEW YORK | Cort T Malone |
| 04821 | 17.00 | 9555.00 | 12.60 | 7182.00 | NEW YORK | Helen J Williamson |
| 05012 | 31.10 | 6686.50 | 31.10 | 6686.50 | NEW YORK | Christopher Hoffman |
| 05014 | 72.80 | 19292.00 | 65.52 | 17362.80 | NEW YORK | Rene Hertzog |
| 05022 | 246.60 | 46854.00 | 246.60 | 46854.00 | NEW YORK | Bo Li |
| 05040 | 27.50 | 2200.00 | 24.75 | 1980.00 | NEW YORK | Channell Meilish |
| 05055 | 91.00 | 17195.00 | 49.26 | 9264.94 | NEW YORK | Johnny Rivera |
| 05069 | 21.60 | 3456.00 | .00 | .00 | NEW YORK | Ryan (Minji) Kim |
| 05081 | 44.90 | 19517.50 | 40.05 | 17421.75 | NEW YORK | Kevin Connolly |
| 05088 | 20.40 | 5408.00 | 18.36 | 4865.40 | NEW YORK | Michael Chung |
| 05127 | 11.80 | 2242.00 | .00 | .00 | NEW YORK | Jeff Jarrett |
| 07010 | 1123.10 | 212876.50 | 922.19 | 175196.93 | NEW YORK | Volker E Antoni |
| 07019 | 174.50 | 51477.50 | 157.05 | 46329.75 | NEW YORK | Kanishka Agarwala |
| 07190 | 134.90 | 32390.50 | 111.51 | 27072.45 | NEW YORK | Victoria Talabacu |
| 07217 | 115.10 | 21610.00 | 91.01 | 17242.50 | NEW YORK | Nathan J Donlon |
| 07334 | 8.00 | 1960.00 | 7.20 | 1764.00 | NEW YORK | Harris E Gershman |
| 07490 | 275.00 | 51640.00 | 172.35 | 32573.25 | NEW YORK | Marjorie Kipp |
| 07760 | 10.30 | 1699.50 | 9.27 | 1529.55 | NEW YORK | Anna S Molina |
| 07811 | 3.60 | 756.00 | .00 | .00 | NEW YORK | Anne C Suffern |
| 09155 | 55.60 | 18348.00 | 50.04 | 16513.20 | NEW YORK | Marc A LaQuercia |
| 09160 | 877.50 | 205897.50 | 781.84 | 182686.95 | NEW YORK | Michael A DiCanio |
| 09161 | 4.20 | 1239.00 | 3.78 | 1115.10 | NEW YORK | Toby B Freund |
| 09162 | .20 | 49.00 | .00 | .00 | NEW YORK | Kristen E Giannone |
| 09163 | 1.10 | 324.50 | .99 | 292.05 | NEW YORK | Amy L Francisco |
| 09508 | 6.00 | 780.00 | .90 | 117.00 | NEW YORK | Tim B Baran |
| 09519 | 2.00 | 380.00 | 1.80 | 342.00 | NEW YORK | Jeffrey Siegel |
| 09639 | 11.00 | 1740.00 | .00 | .00 | NEW YORK | Nicholas J Balsdon |
| 09817 | 282.00 | 59770.00 | 229.18 | 48895.35 | NEW YORK | Karen G Rozinski |
| 09819 | 187.20 | 18478.00 | 91.12 | 10007.94 | NEW YORK | Michaela C Nitoi |
| 09824 | 575.60 | 117342.00 | 328.48 | 67086.97 | NEW YORK | Daryl Lyew |
| 09825 | 9.10 | 2095.00 | 8.23 | 1878.55 | NEW YORK | Izak Feldgreber |
| 09852 | 64.00 | 13760.00 | 64.00 | 13760.00 | NEW YORK | Christopher Bush |
| 09854 | 1.00 | 150.00 | .00 | .00 | NEW YORK | Dan Nastu |
| 09876 | 58.00 | 11530.00 | 45.90 | 9180.00 | NEW YORK | Corina K Nastu |
| 09943 | 122.30 | 24460.00 | 110.07 | 22014.00 | NEW YORK | Claudia A Ilie |
| 09964 | 2.40 | 480.00 | 2.16 | 432.00 | NEW YORK | Robin Pramanand |
| 90027 | .30 | 33.00 | .27 | 29.70 | NEW YORK | Allison Primus |
| 90189 | 7.00 | 1430.00 | 7.00 | 1430.00 | NEW YORK | Steven M Lichtenberger |
|  | 7421.90 | 2309213.50 | 6198.09 | 2007377.43 | NEW YORK |  |
| 02639 | .20 | 68.00 | .20 | 68.00 | NEW JERSEY | Nicholas M Insua |
| 05049 | 28.00 | 4010.00 | .00 | .00 | NEW JERSEY | Theresa L. Johnson |
| 05130 | 2359.40 | 690007.00 | 2099.40 | 610300.43 | NEW JERSEY | Jennifer D Katz |
| 05136 | 101.00 | 14922.50 | 98.94 | 14612.90 | NEW JERSEY | Francesca Henry |
|  | 2488.60 | 709007.50 | 2198.54 | 624981.33 | NEW JERSEY |  |
| 05056 | 1.50 | 157.50 | 1.50 | 157.50 | PENNSYLVANIA | Katrina Batista |
| 05057 | 102.40 | 28160.00 | 78.12 | 21483.00 | PENNSYLVANIA | Bryan Petrilla |
| 05073 | 24.40 | 5978.00 | 19.62 | 4806.90 | PENNSYLVANIA | Jeremy F. Heinnickel |
| 05080 | 40.20 | 13467.00 | 34.65 | 11607.75 | PENNSYLVANIA | Toki Rehder |
| 05090 | 84.70 | 20751.50 | 76.23 | 18676.35 | PENNSYLVANIA | Whitney Clymer |
| 05118 | 54.20 | 13279.00 | 20.61 | 5049.45 | PENNSYLVANIA | Matthew Rosso |

Time Recap Summary by TimekeeperLocation And Timekeeper [100317 - BRAY & GILLESPIE]          Page 2
  Currency Code:  6/13/2008 3:06:34 PM

| Timekeeper | Work Hours | Work Amount | Bill Hours | Bill Amount | Description | Description |
|---|---|---|---|---|---|---|
| 05546 | 2.90 | 783.00 | 2.90 | 783.00 | PENNSYLVANIA | Ellan D Bailey |
| 05552 | 434.90 | 215685.50 | 393.67 | 195057.45 | PENNSYLVANIA | Michael X Conley |
| 05579 | .80 | 244.00 | .00 | .00 | PENNSYLVANIA | Luke E Debevec |
| 05585 | 203.50 | 109300.00 | 188.63 | 101121.40 | PENNSYLVANIA | John N Ellison |
| 05694 | 299.00 | 105719.75 | 275.39 | 96374.99 | PENNSYLVANIA | Pamela D Hans |
| 05850 | 2823.90 | 840726.00 | 2616.20 | 775236.46 | PENNSYLVANIA | William H Pillsbury |
| 05874 | 2.80 | 1078.00 | 2.52 | 970.20 | PENNSYLVANIA | Jackie Taylor Meier |
| 05885 | 2.00 | 350.00 | 1.80 | 315.00 | PENNSYLVANIA | Michelle Todd |
| 05892 | 1.00 | 130.00 | 1.00 | 130.00 | PENNSYLVANIA | Beth A Young |
| 07298 | 254.00 | 47480.00 | 225.93 | 42213.10 | PENNSYLVANIA | Karen S Frankel |
|  | 4332.20 | 1403289.25 | 3938.77 | 1273982.55 | PENNSYLVANIA |  |
|  |  |  |  |  |  |  |
| 05021 | 3.00 | 450.00 | .00 | .00 | CHICAGO | Noel Paul |
|  | 3.00 | 450.00 | .00 | .00 | CHICAGO |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  | 14245.70 | 4421960.25 | 12335.40 | 3906341.31 |  |  |

# EXHIBIT D

**BRAY & GILLESPIE**
**AMOUNT OWED SPREADSHEET**

| Month | Billed | Paid | Owed | Running Balance |
|---|---|---|---|---|
| Jul-06 | 103,366.49 | 0.00 | 103,366.49 | |
| Aug-06 | 108,529.61 | 0.00 | 108,529.61 | 211,896.10 |
| Sep-06 | 0.00 | 103,366.49 | -103,366.49 | 108,529.61 |
| Oct-06 | 0.00 | 108,529.61 | -108,529.61 | 0.00 |
| Nov-06 | 127,715.39 | 0.00 | 127,715.39 | 127,715.39 |
| Dec-06 | 287,975.39 | 365,926.51 | -77,951.12 | 49,764.27 |
| Jan-07 | 129,970.38 | 23,169.25 | 106,801.13 | 156,565.40 |
| Feb-07 | 221,132.81 | 139,959.57 | 81,173.24 | 237,738.64 |
| Mar-07 | 195,001.33 | 4,274.50 | 190,726.83 | 428,465.47 |
| Apr-07 | 186,628.26 | 31,850.71 | 154,777.55 | 583,243.02 |
| May-07 | 200,651.71 | 112,864.79 | 87,786.92 | 671,029.94 |
| Jun-07 | 157,909.17 | 0.00 | 157,909.17 | 828,939.11 |
| Jun-07 | 0.00 | 259,157.19 | -259,157.19 | 569,781.92 |
| Jul-07 | 0.00 | 203,123.79 | -203,123.79 | 366,658.13 |
| Aug-07 | 391,545.39 | 99,931.28 | 291,614.11 | 658,272.24 |
| Sep-07 | 161,538.52 | 52,981.36 | 108,557.16 | 766,829.40 |
| Oct-07 | 124,173.44 | 157,579.74 | -33,406.30 | 733,423.10 |
| Nov-07 | 246,276.64 | 258,971.90 | -12,695.26 | 720,727.84 |
| Dec-07 | 223,920.10 | 87,515.06 | 136,405.04 | 857,132.88 |
| Feb-08 | 437,376.18 | 21,799.45 | 415,576.73 | 1,272,709.61 |
| Mar-08 | 416,223.46 | 0.00 | 416,223.46 | 1,688,933.07 |
| Apr-08 | 377,456.72 | 0.00 | 377,456.72 | 2,066,389.79 |
| **TOTALS** | 4,097,390.99 | 2,031,001.20 | **2,066,389.79** | |

# EXHIBIT E

## Christopher, Hazel V.

**From:** Harold Lueken [hlueken@oceansresorts.com]
**Sent:** Sunday, September 30, 2007 7:06 PM
**To:** Lane, Michael J.; hlueken@oceanwatersmanagement.com; mcater@oceanwatersdevelopment.com
**Cc:** Ellison, John N.; Christopher, Hazel V.
**Subject:** RE: B+G

Thank you. Harold

**From:** Lane, Michael J. [mailto:Mlane@andersonkill.com]
**Sent:** Friday, September 28, 2007 2:13 PM
**To:** hlueken@oceanwatersmanagement.com; mcater@oceanwatersdevelopment.com
**Cc:** Ellison, John N.; Christopher, Hazel V.
**Subject:** B+G

Harold:

As I told you yesterday, John and I have gotten the Firm's approval to delay B+G's payment of $300,000 of the amount of fees presently outstanding, until on or before 2/28/08. We do so wanting you to know that B+G is a valued client of the firm, that we appreciate your business, and that we greatly enjoy working with you. We hope this will assist you during this "slower season." As we discussed, the balance of the fees due and to become due, will be paid as B+G has done, on or before approximately 60 days after billing.

Best.

Mike

This electronic mail transmission may contain privileged, confidential and/or proprietary information intended only for the person(s) named. Any use, distribution, copying or disclosure to another person is strictly prohibited. If you are not the addressee indicated in this message (or responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email.
*********************************************************** IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed therein.