UNITED STATES DISCTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANDERSON KILL & OLICK, P.C.,

                      Plaintiff,

- against -

BRAY & GILLESPIE, INC.; BRAY & GILLESPIE MANAGEMENT, LLC; CHARLES A. BRAY and JOSEPH GILLESPIE,

                      Defendants.

Index No.: 1:08-cv-4565 (AKH) (RLE)

Electronically Filed

**DECLARATION OF HAROLD W. LUEKEN**

    1.    I am a former employee of Bray & Gillespie, Inc. d/b/a Ocean Waters, Inc., Mr. Charles Bray ("Bray") and Mr. Joseph Gillespie ("Gillespie") (who, along with Bray & Gillespie Management, LLC, are referred to herein "Defendants" or "B&G"). During my period of employment, I worked on behalf of B&G and all of its and their related entities.

    2.    I submit this declaration (1) in opposition to B&G's motion to dismiss the Complaint because of lack of personal jurisdiction and improper venue or, in the alternative, to transfer the case to the Middle District of Florida, (2) in opposition to B&G's motion to dismiss under Fed. R. Civ. P 9(b) and 12(b)(6), and (3) in support of Plaintiff Anderson Kill & Olick's ("AKO") motion for partial summary judgment on its cause of action for an account stated. I am fully familiar with the facts and circumstances set forth herein except as to those based upon my information and belief, as so noted.

894649_6

## My Employment with B&G

3.     I entered B&G's employment as Senior Vice President and General Counsel in April 2006. In September 2006, I was promoted to Executive Vice President and Chairman of the Executive Committee. In October 2007, I was promoted to Chief Operating Officer of B&G and continued as Chairman of the Executive Committee. At that time, the members of the Executive Committee included myself, Robert Rathke, Steve Nalley, Tim Stockman, Robert Pici, Kent Hricko, Libby Gallant, and Robert Schamberg.

4.     I was terminated from B&G's employment by Mr. Bray on March 4, 2008. Throughout my employment at B&G, I was the individual designated by Messrs. Bray and Gillespie to coordinate and supervise the legal services that AKO was providing and to report directly to Messrs. Bray and Gillespie about those services. Mr. Bray also directly supervised AKO.

5.     In my capacity as General Counsel, I was empowered by B&G to, and in fact did, retain AKO to represent B&G in various legal matters and litigations. The first matter for which AKO was retained was to pursue B&G's claims against Lexington Insurance Company ("Lexington") seeking full coverage for the devastating damages B&G's properties sustained from the hurricanes that struck the Daytona Beach area in August and September 2004. Contrary to his sworn declaration, Mr. Nalley had no role in hiring law firms while I was employed by B&G.

6. In September 2006, when I was promoted to Executive Vice President and Chairman of the Executive Committee, B&G hired Robert Rathke as General Counsel and Senior Vice President. However, because the specific factual knowledge I had gained from my involvement with the litigations that AKO was handling for B&G, I continued to be the principal individual at B&G working on the matters that AKO was handling for B&G. During this time, I was assisted by Maya Cater and others.

### B&G Retains AKO

7. After receiving and reviewing the credentials of various law firms, Mr. Bray advised Mr. Lueken that AKO should be retained. B&G's retention of AKO was memorialized in a retainer agreement (the "Retainer Agreement") that Michael J. Lane of AKO sent to me on or about May 30, 2006. (A true copy of the Retainer Agreement dated May 30, 2006, is attached hereto to Defendants' moving papers at Ex. D.) I reviewed the Retainer Agreement with Mr. Bray. After getting his approval, I counter-signed the Retainer Agreement and sent it back to Mr. Lane in New York.

8. In the Retainer Agreement, B&G contracted with AKO to represent "Bray & Gillespie" in connection with its dispute with Lexington, "and possibly others," in connection with the losses B&G suffered in 2004, because of hurricane damage at various of its hotels. The use of "Bray & Gillespie" was a generic way to cover all relevant entities among the very many Bray & Gillespie entities that existed. Upon information and belief, over time AKO represented at least twelve B&G entities.

9. I recommended Mr. Lane and AKO as litigation counsel because of my long-time relationship with Mr. Lane, including the work he and AKO had done for Kmart Corporation, when I was Senior Vice President and General Counsel there from 2003-2005. Most importantly, I knew that AKO has an international reputation for their work in representing policyholders seeking coverage from insurance companies. In addition, Mr. Bray said he had a prior relationship with Arthur Olick of AKO.

10. From the beginning of AKO's representation of B&G, it was understood that Mr. Lane would be the leader of the team representing B&G. As the leader, Mr. Lane recommended and introduced me to his then-partner, John Ellison, who Mr. Lane recommended could provide specific and necessary insight into insurance law because of his expertise in that area of the law. I reviewed Mr. Ellison's curriculum vitae and was pleased that he had been added to the team. I knew that Mr. Ellison was principally based in Philadelphia (being the Managing Shareholder of AKO's Philadelphia office), but was aware that he also maintained an office in AKO's New York City headquarters. I also reviewed this information with Mr. Bray, and discussed with him that Mr. Lane would be leading these cases. Mr. Bray approved of conducting the representation in this manner.

11. As stated in the Retainer Agreement, I was fully aware of Mr. Lane's billing rate and the range of rates of the other attorneys at AKO who would work on B&G matters. Mr. Bray also was aware of these rates as I reviewed AKO's Retainer Agreement with him.

### B&G Submitted to the Jurisdiction of the New York Courts

12. As part of the retention, I fully expected that B&G was submitting itself to the jurisdiction of the courts of New York. That submission was specifically supported by the Retainer Agreement's statement that "[B&G] may have the right to arbitration of the [fee] dispute pursuant to Part 137 of the (New York) Rules of the Chief Administrator." Indeed, the Retainer Agreement itself was sent to B&G (as it so states), pursuant to the "[r]ules of the Appellate Divisions of the Supreme Court [of New York]." I and B&G never objected to being bound by these New York rules or being subject to the jurisdiction of the New York courts.

13. During the 22 months that AKO worked for B&G, I routinely would contact Mr. Lane in New York at least several days a week (including weekends) to discuss status, new matters, or questions about the representations that I or Mr. Bray or Mr. Gillespie had. Also, there were times that Mike and I did not speak for several days in a row, but I know that he had conversations with Ms. Cater and others at Ocean Waters. Prior to the retention and afterwards during the work AKO performed for B&G, I literally made hundreds of telephone calls and sent hundreds of emails to AKO and Mr. Lane in New York. Messrs. Bray and Gillespie participated in many of these calls.

14. Following the initial engagement described above, B&G requested and retained AKO's services on a number of other matters. These matters and the dates of retention, are as follows:

(a) On or about August 7, 2006, B&G retained AKO for a new matter known as "Surfside."

(b) On or about August 7, 2006, B&G retained AKO for a new matter known as "Belfor."

(c) On or about August 16, 2006, B&G retained AKO for a new matter known as "General Insurance."

(d) On or about November 9, 2006, B&G retained AKO for a new matter known as "Gretna."

(e) On or about November 9, 2006, B&G retained AKO for a new matter known as "Citizens."

(f) On or about March 20, 2007, B&G retained AKO for a new matter known as "Citizens - Conch House."

(g) On or about March 20, 2007, B&G retained AKO for a new matter known as "Citizens - Esquire."

(h) On or about March 20, 2007, B&G retained AKO for a new matter known as "Citizens - Sailmaker."

(i) On or about June 25, 2007, B&G retained AKO for a new matter in connection with claims arising from its purchase of an insurance policy from Citizens Property Insurance Corporation.

15. Mr. Lane was the AKO attorney responsible for all of these representations and he was the one at AKO who coordinated out of AKO's New York office the work AKO was doing for each matter.

16. Both Messrs. Bray and Gillespie repeatedly stated to me at various times that they were pleased with the work the AKO team was doing and, in particular, the work Mr. Lane was doing.

17. As set forth in the Retainer Agreement, AKO regularly submitted monthly invoices to B&G for the above-referenced matters which reflected the fees for services rendered and disbursements incurred. After retaining AKO and throughout my tenure at B&G (i.e., until I was terminated on March 4, 2008), I was responsible for reviewing all monthly invoices received from AKO for services rendered and expenses incurred. These invoices were submitted to my attention, and all submitted invoices were regularly examined by me and/or those who reported to me (in some instances, Maya Cater). I would review them, discuss them with Mr. Bray, and then approve them. These statements were sent initially to Sydney Sloam in Accounting whereupon either she or Mr. Bray would arrange for payment. Sometime in late 2006, Mr. Nalley took over Mr. Sloam's role in Accounting. Upon information and belief, B&G paid AKO approximately $2 million -- and approximately $2 million is still due and owing.

18. Following the process described above, I reviewed and approved all invoices submitted by AKO up to and including those invoices dated

December 31, 2007 -- which were sent with cover letters dated January 3, 2008. I believed then and believe now that all professional services I approved were rendered as stated and appropriately billed. I was empowered by B&G to approve such AKO invoices -- as I had been doing since the Spring of 2006. These approved statements were sent to Mr. Sloam and Mr. Nalley in Accounting for payment by B&G.

19. Commencing as of January 2007, as a courtesy to B&G, AKO offered B&G a 10 percent discount of all AKO fees billed. B&G accepted this discount and it was applied to bills from that date through my departure in January 2008. In addition, Mr. Lane made other pre-bill write-offs. Upon information and belief, the total of these write-offs was in the amount of at least $430,000. Despite AKO's submission of invoices and my timely review and approval of same, B&G failed to render full, or any, payment on many invoices. All of the AKO invoices submitted to B&G are attached to the accompanying Declaration of Michael J. Lane.

### The $300,000 Deferral

20. In August of 2007, at the request of Mr. Bray, I asked Mr. Lane if AKO would be willing to defer a portion of the fees then owed to it for legal services and associated expenses. At that time, the accrued debit balance was approximately $600,000, and Mr. Bray sought to have half that amount deferred for a period of time.

21. Toward the end of September, 2007, I called Mr. Lane and requested that $300,000 of the then current debit balance be deferred until the end of February, 2008.

22. On September 28, 2007, I received an email from Mr. Lane agreeing to the requested referral on the condition that "the balance of the fees due and to become due, will be paid as B&G has done, on or before approximately 60 days after billing." I responded on September 30, 2008, "Thank you. Harold.", indicating that I accepted the conditions for the deferral. I understand that a copy of the email string is being submitted as an Exhibit to Mr. Lane's declaration.

23. Shortly thereafter, I told Mr. Lane in a telephone conversation that Mr. Bray and the B&G organization greatly appreciated the deferral.

### Mr. Ellison Goes To Reed Smith

24. In late December 2007/early January 2008, Mr. Ellison elected to join Reed Smith; and Mr. Lane elected to stay at AKO. However, during the transition months of January and February, 2008, the entire team continued to work together on the B&G matters.

25. Contrary to B&G's declarations, when it became clear that Mr. Lane was staying at AKO and Mr. Ellison was leaving for Reed Smith, Mr. Lane spoke with me and recommended that Mr. Ellison continue on the "B&G team" (despite his moving

894649_6                                9

to a new firm), as it did not make legal or business sense to bring another "insurance expert" on to the team -- and we were working well together.

26. I checked with Mr. Bray to see whether Mr. Bray would approve of two large law firms working together. Mr. Bray agreed to have the team as Mr. Lane suggested, with Mr. Ellison at Reed Smith, continuing on the "B&G team."

27. Thus, despite learning that Mr. Ellison and several associates who had been on the B&G team were going to Reed Smith, B&G determined to retain AKO as counsel. In fact, in January and February, Maya Cater came to New York to meet with the AKO attorneys who were remaining on the engagement.

28. I believe that when B&G learned in February 2008 that Mr. Ellison and other AKO lawyers were moving to another firm, B&G sensed that this provided an opportunity to renege on its financial obligations to AKO -- which was owed significant monies. B&G then dishonored its obligation to AKO to pay all its arrears – including the $300,000 that had been deferred from September of 2007 -- at the end of February 2008 and terminated AKO on March 28, 2008.

### B&G' Frequent Trips to New York to Raise Capital

29. From October 2007 until the termination of my employment at B&G on March 4, 2008, I, along with Mr. Bray, Mr. Gillespie and others, worked diligently to raise capital for the B&G entities. This work included meeting with various entities in New York.

30. Specifically, I, Mr. Gillespie and Mr. Hricko traveled to New York to meet with various potential lenders and equity sources. We on behalf of

B&G and its and their related entities signed confidentiality agreements in New York.

31.   During my employment, I made at least four trips to New York to engage in business for B&G. Mr. Gillespie made approximately the same number of trips to New York for B&G business. Mr. Hricko made one trip to New York for B&G business. In addition, at my direction, Maya Cater made two trips to New York for B&G business. During both of these trips, Ms. Cater went to AKO's offices in New York for meetings with (1) a potential financing source for B&G and (2) Mr. Lane and other AKO attorneys.

32.   Upon information and belief, B&G had its personnel attend hospitality related trade shows in New York. Upon information and belief, B&G caused direct mailings to be sent to New York. Upon information and belief, B&G conducted advertising in New York. Upon information and belief, New York residents have traveled to and stayed at B&G hotels.

### AKO's Significant Victory

33.   In August 2006, AKO successfully obtained for B&G complete coverage under its policy with Lexington Insurance Company ("Lexington") in the full amount ($25 million, less deductible) for damages suffered from the second major hurricane (Hurricane Frances), which hit the Daytona Beach area in September 2004. This was a major success for B&G and greatly benefited B&G financially. Messrs. Bray & Gillespie were extremely pleased with AKO's work and this result.

34. Contrary to the Statements in Defendants' declarations about Mr. Lane's relationship with me, I had explained to Mr. Bray that Mr. Lane and I had both gone to Fordham Law School – but not at the same time.

35. Although I presently live in Ormond Beach Florida, it is my present intention to move back to the metropolitan New York City area in the next several months.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Ormond Beach, Florida on July 1, 2008.

_____
HAROLD W. LUEKEN